**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **FOODIE PARTNERS** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 2:06-CV-12** |
| | § | |
| **JAMBA JUICE COMPANY** | § | |

## MEMORANDUM OPINION AND ORDER

The Court now issues this claim construction opinion construing the terms in U.S. Patent No. 5,950,448 (hereinafter "the '448 patent"). Plaintiff Foodie Partners (hereinafter "Foodie") asserts that Defendant Jamba Juice Company has infringed, actively induced others to infringe, and contributorily infringed claims 2, 3, 4, and 5 of the '448 patent.[1]

### THE '448 PATENT

The '448 patent is entitled "System, Method and Apparatus For Dispensing and Combining Refrigerated Source Liquids," and deals with a system and apparatus for combining and dispensing liquids, ice and flavoring additives to create slush-type beverages.

### APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Communications Group,*

---

[1]Although Foodie initially asserted infringement of claim 1 of the '448 patent as well, Foodie agreed to drop claim 1 prior to the *Markman* hearing, and it is no longer at issue in the case.

*Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  This intrinsic evidence includes the claims themselves, the specification, and the prosecution history.  *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861.  Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent.  *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms.  *Phillips*, 415 F.3d at 1314.  First, a term's context in the asserted claim can be very instructive.  *Id*.  Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent.  *Id*.  Differences among the claim terms can also assist in understanding a term's meaning.  *Id*.  For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation.  *Id*. at 1314-15.

Claims "must be read in view of the specification, of which they are a part."  *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995)).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope.  *Phillips*, 415 F.3d at 1316.  In these situations, the inventor's lexicography governs.  *Id*.  Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained

from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325.  But, "although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."  *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); *see also Phillips*, 415 F.3d at 1323.  The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent.  *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862).  Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent.  *Id*. at 1318.  Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court.  *Id*.  Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms."  *Id*.

Finally, it is important to remember that although the specification often describes very specific embodiments of the invention, the Federal Circuit has cautioned against confining the claims to those embodiments.  *See Phillips*, 415 F.3d at 1323.  The roles of the specification are to "teach and enable those of skill in the art how to make and use the invention and to provide a best mode for

3

doing so.  One of the best ways to teach a person of ordinary skill how to make and use the invention

is to provide an example of how to practice the invention in a particular case." *Id*.  "'[T]he claims

of the patent, not its specifications, measure the invention.'" *Innova/Pure Water, Inc. v. Safari Water

Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004) (citation omitted).  "Accordingly,

particular embodiments appearing in the written description will not be used to limit claim language

that has broader effect.  And, even where a patent describes only a single embodiment, claims will

not be interpreted 'restrictively unless the patentee has demonstrated a clear intention to limit the

claim scope 'using words or expressions of manifest exclusion or restriction.'" *Id*. at 1117 (citations

omitted).

The Court begins, as it must, with the words of the claim.  *See Teleflex*, 299 F.3d at 1324;

*see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("The terms

used in the claims bear a presumption that they mean what they say and have the ordinary meaning

that would be attributed to those words by persons skilled in the relevant art.").

### TERMS TO BE CONSTRUED

The terms at issue are: "a remotely located refrigeration unit," "refrigerated source liquid

conduit line," "a customer service station," "a product finishing station," "a portion control

mechanism," "consumer service station beverage tapping mechanism," "beverage flow reporting

device," "beverage flow measurement device," "refrigerated source liquid," "a cold pan," "a drip

pan," "a breath guard," and "integrated or detached drain board."

### *Agreed Terms*

At the *Markman* hearing held on August 21, 2007, the parties agreed on the construction of

4

the following terms: "portion control mechanism," "beverage flow reporting device,"[2] "beverage

flow measurement device," and "integrated or detached drain board."  The parties agreed that the

definition of "integrated or detached drain board" should be "a surface that is joined with the rinse

sink, but can be separate from the rinse sink."  *See* Transcript of *Markman* Hearing at 62-63, *Foodie*

*Partners v. Jamba Juice Co.*, Civ. No. 2:06-cv-12 (E.D. Tex. 2007).  Both parties agreed that the

definition of "beverage flow reporting device" should be "a mechanism or computer-based system

which collects and reports beverage flow data."  *See* Transcript of *Markman* Hearing at 49.  The

parties also agreed that the definition of "beverage flow measurement device" should be "a

mechanism or computer-based system for ascertaining a quantity of flow of at least one source

liquid."  *See* Transcript of *Markman* Hearing at 49-50.  Finally, the parties agreed that "portion

control mechanism" means "a mechanism for controlling the amount of source liquid dispensed

according to preset volume or time metered constraints."  *See* Transcript of *Markman* Hearing at 42-

43.

      The Court adopts these agreed constructions as the constructions of the Court.

---

[2]At the *Markman* hearing, the parties agreed on a construction of "beverage flow reporting device."  The parties' agreed construction for the term was "a mechanism or computer-based system which collects and reports beverage flow data."  Shortly after the hearing, Foodie filed a notice stating it felt that the term "collects" in the agreed construction is redundant and possibly ambiguous in light of the construction of "beverage flow measurement device."  The Court disagrees.

      The terms "beverage flow reporting device" and "beverage flow measurement device" are often discussed together in the specification.  One aspect of these devices is that they maintain dispensing statistics for subsequent analysis.  *See* '448 patent col. 6 ll. 12-13 (the reference to Berg in this part of the patent incorporates the measurement and reporting devices as stated in the discussion from '448 patent col. 4 ll. 57-67).  The term "maintain" as used in the specification carries a similar meaning to collect, especially in reference to gathering the relevant statistics for report.  Maintenance or collecting of the data to be reported appears to be integral to the utility of these devices, as the "reporting" purpose of the "beverage flow reporting device" would be frustrated without a collection of the relevant data to report.  It appears from the parties' agreed construction that a "beverage flow measurement device" has no such data collection or maintenance elements, and merely "ascertains a quantity of flow."  To "ascertain" merely means to determine or measure, not necessarily to "collect."  The Court finds that the collection / maintenance of data for the purpose of reporting is supported by the specification, and accordingly should be included in the construction of "beverage flow reporting device."  With all of the above considerations in mind, the Court will adopt the parties' agreed construction of "beverage flow reporting device" as stated herein.

### 1.    *"Refrigerated source liquid"*

The parties agree that "refrigerated source liquid" means "juice, yogurt, etc. which serves as base level ingredients in the preparation of pulverized, slush-like consistency consumer beverages." *See* '448 patent col. 1 l. 10.  The parties disagree, however, over whether "at least one" needs to be included in the construction of "refrigerated source liquid."  The issue of whether "at least one" should be included in both the terms to be construed and the definition runs throughout a number of the terms.  Foodie argues that if the term itself includes "at least one," then the definition should include it also.  The Court agrees with that proposition, but also agrees with Jamba Juice that "at least one" should not actually be included  in any of the terms at issue.[3]  The meaning of "refrigerated source liquid" is what is at issue, and "at least one" is not relevant to the construction of the actual term (or any of the other terms including "at least one").  Moreover, "at least one" is obvious to the jury and need not be construed, and it would be cumbersome and redundant to include the extra phrase in both the terms to be construed and in the definitions.  Accordingly, because the Court finds that "at least one" should not be included in any of the terms to be construed, the Court adopts the parties' agreed construction as stated above for "refrigerated source liquid" as the construction of the Court.

### 2.    *"Refrigerated source liquid conduit line"*

---

[3]At the *Markman* hearing, neither of the parties were overly adamant about whether "at least one" should be included in the individual terms.  Foodie's counsel, who sought to have "at least one" included, stated the following: "I think you can have it one way  or the other.  I prefer to have "at least one" in there because  in most of these cases when we're referring to a claim term, it's an entire phrase or clause together, so "at least one" is always part of that claim term.  So if you're taking it out of there, I think there is a potential it might create confusion with the jury and force them to take an extra term in interpreting an element of "at least one" back into the claim term.  So my preference is to include it, but I think you're right, we need to have it one way or the other to avoid confusion."  Transcript of *Markman* Hearing at 23, *Foodie Partners v. Jamba Juice Co.*, Civ No. 2:06-cv-12 (E.D. Tex. 2007).  Both parties were essentially asking the Court to include "at least one" in all of the relevant terms or remove it from all of them in the interest of avoiding confusion.

For "refrigerated source liquid conduit line," Foodie offers a proposed construction of "at least one channel through which the source liquid is conveyed from the refrigeration unit," while Jamba Juice offers "a channel (or pipe) through which a refrigerated source liquid is conveyed."  The only difference between the parties' proposals reflects the only dispute the Court must decide, namely whether the "remotely located refrigeration unit" must be connected to the "customer service station" through a "refrigerated source liquid conduit line."

Jamba Juice argues that  the specification does not say that the refrigerated source liquid conduit lines are connected to the remotely located refrigeration unit.  Instead, Jamba Juice contends the specification calls for the refrigerated source liquid conduit lines to be connected to the source liquid inside refrigerated liquid containers, not the unit itself.  In support of its assertions, Jamba Juice offers the following lines from the specification: (1) "[a] most common form of containerized distribution provides such liquids to the retailer in pressurized steel, or similarly constructed metal tanks.  In this instance, once connecting the refrigerated source liquid to refrigerated transport lines..." '448 patent col. 4 ll. 3-10, and (2) "[r]efrigerated source liquids such as juices, yogurt, etc. are refrigerated and stored in such remote facility until such time as they are needed." '448 patent col. 5 ll. 53-56.  Foodie responds that the patent very clearly calls for a connection of the customer service station and the remote refrigeration unit via the refrigerated conduit lines, and offers the following as support: "[u]pon determining the consumer's refrigerated source liquid requirement(s), a [customer service station] beverage tapping mechanism  2.55 is engaged and such designated refrigerated source liquids are pumped or propelled, via refrigerated conduit lines 2.30 from the remote walk-in refrigerator 2.10 to the [customer service station]." '448 patent col. 6 ll. 3-8.

Both parties point to embodiments in the patent to support their contentions.  Jamba Juice

7

argues that embodiments four and five show the refrigerated tanks connected to the conduit lines sitting beneath the counter, not connected to a refrigeration unit.  '448 patent figs. 4-5.  Foodie counters that in order to save space, which is the purpose of the patent, the conduit lines must connect the remote refrigeration unit and a customer service station, and claims that Figure 2 shows this to be the preferred embodiment.  *See* '448 patent fig. 2.  In response to Foodie's preferred embodiment argument, Jamba Juice claims that even if connection directly to the remote refrigeration unit was the preferred embodiment in the patent, there is no requirement that the Court limit the claim to the preferred embodiments.  Only if the patentee expresses clear disavowal of any other configuration should the Court limit the claims only to the preferred embodiment.  *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1357-58 (Fed. Cir. 2006).

Finally, while Foodie claims the invention would not work if the conduit lines did not connect the source liquid in the refrigeration unit to a customer service station, Jamba Juice argues the patent does not mandate such an interpretation, and that the source liquid could be removed from the refrigeration unit and still connected to a customer service station without frustrating the purpose of the patent.  Jamba Juice argues that the patent itself states "while this invention has been described in reference to illustrative embodiments, this description is not to be construed in a limiting sense," and that there are no manifest words of exclusion that should limit the patent solely to Foodie's proposed interpretation that the remote refrigeration unit is connected to a customer service station via the conduit lines in question.  *See* '448 patent col. 7 ll. 18-20.

What the dispute amounts to is that certain embodiments in the  patent show the refrigerated tanks inside the remotely located refrigeration unit.  Foodie is essentially arguing for a narrower construction, saying that since the tanks are inside the refrigeration unit in Fig. 2, the conduit lines

must therefore connect the refrigeration unit to a customer service station.  Jamba Juice is arguing

for a broader interpretation whereby a connection between the refrigeration unit and customer service

station is not specifically required by the claims.  In resolving this dispute, the Court begins, as it

must, with the words of the claim.  *See Teleflex*, 299 F.3d at 1324.  Claims "must be read in view

of the specification, of which they are a part."  *Markman*, 52 F.3d at 968.  After considering all of

the arguments of the parties, the Court finds Jamba Juice's construction more persuasive.

The claims do not discuss the refrigerated source liquid conduit lines connecting the remote

refrigeration unit and a customer service station.  The only reference in the claims to any sort of

connection to a customer service station refers to a connection between the source liquid and the

consumer service station beverage tapping mechanism: "comprising ... a customer service station

including ... at least one refrigerated source liquid conduit line, the refrigerated source liquid conduit

line connecting said refrigerated source liquid and said consumer service station beverage tapping

mechanism." '448 patent col. 8 ll. 11-15.  While, as Foodie points out, the specification does discuss

pumping refrigerated liquids via refrigerated conduit lines, that is not what the patent claims.  The

claims of the patent establish and limit the patentee's right to exclude, by describing the outer

boundaries of the invention.  *CIAS, Inc. v. Alliance Gaming Corp.*, — F.3d ----, 2007 WL 2791695

(Fed. Cir. 2007).  Here, the claims do not establish any boundary excluding the possibility that a

customer service station might be connected to the source liquid in tanks outside the refrigeration

unit, and the Court finds nothing in the specification which would limit the invention in such a

manner.  The Federal Circuit has cautioned against confining the claims to even specific

embodiments.  *See Phillips*, 415 F.3d at 1323.  Particular embodiments appearing in the written

description are not be used to limit claim language that has broader effect.  Foodie's interpretation

improperly limits the claims.

Therefore, the Court's construction leaves open the possibility that the conduit lines might convey source liquid from tanks outside the refrigeration unit.  The Court finds that a  "refrigerated source liquid conduit line" is "a channel through which a refrigerated source liquid is conveyed."

**3.**     ***"A remotely located refrigeration unit"***

Foodie contends this term should be construed to mean "a structure, for storing at least one source liquid below room temperature, which is located outside of the customer service station and connected to it through at least one refrigerated source liquid conduit line," while Jamba Juice offers as their proposed construction "a structure for storing substances at temperatures below room temperature displaced from the customer service station."   The dispute here is identical to the parties' dispute regarding "refrigerated source liquid conduit line," namely whether or not the patent mandates that the "remotely located refrigeration unit" must be connected to the customer service station via a "refrigerated source liquid conduit line."   The parties agree on the remainder of the construction.

The Court's analysis on this issue is identical to its analysis in construing "refrigerated source liquid conduit line."   While the specification does discuss pumping refrigerated source liquids via the conduit lines from the remotely located refrigeration unit, that is not what the patent claims, and there is no clear support in the specification for Foodie's attempt to construe the claim in such a manner.   Accordingly, the Court adopts Jamba Juice's proposal as the construction of the Court: "a structure for storing substances at temperatures below room temperature displaced from the customer service station."

**4.**     ***"A customer service station"***

For its proposed construction, Foodie offers the following: "any area(s) from which a customer can be served." Jamba Juice proposes: "a specific location where an employee stands to dispense the refrigerated source liquid and delivers the consumer consumption vessel to the consumer. All elements contained within the customer service station are within reach of a stationary employee." The main disputes between the parties regarding "customer service station" are whether the claims are limited to a single station, whether a customer service station and product finishing station can be one station or must be separate, and the boundaries or size of a customer service station.

Regarding whether the patent precludes more than one customer service station, the Federal Circuit has repeatedly held that an indefinite article "a" or "an" in patent parlance carries the meaning of "one or more" in open-ended claims containing the transitional phrase "comprising." *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999); *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997). When the claim language or context calls for further inquiry, courts consult the written description for a "clear intent to limit the invention to a singular embodiment." *KCJ Corp.*, 223 F.3d at 1357. "When claim language or context suggests an ambiguity in application of the general meaning of an article, [the] court undertakes an examination of the written description and the prosecution history to ascertain whether to limit the meaning of "a" or "an." *Id.*

The Court notes that the claim uses "comprising" in conjunction with "a customer service station," which under Federal Circuit precedent does not preclude multiple customer service stations. The next step in the analysis requires courts to comb through the patent and determine if there was an overt attempt to limit the object or place associated with the article "a" or "an" to a single unit.

11

In the present circumstances, there is no significant evidence in the specification indicating that the article "a" forecloses the possibility of more than one station. Jamba Juice argues that the definition of "station" is singular, and also that Figure 2 in the patent indicates two separate areas, thereby indicating (along with the claims) separate "customer service station" and "product finishing station" areas comprised of separate things. Jamba Juice claims that Foodie is trying to expand the construction such that the items the patent states are within the "customer service station" could be located in any part of the store without any relation to each other, thereby expanding the term "customer service station" to include most anything and everything. Jamba Juice's argument ultimately does not necessitate looking past the guidance provided by the Federal Circuit. While "station" is indeed singular, under Federal Circuit precedent the use of "comprising a" to reference a location or item means one or more unless otherwise limited in the patent. Finding no such limitation, the Court's construction of the term also does not preclude more than one "customer service station."

Regarding whether the "customer service station" must be a separate area from a "product finishing station," both parties note that the claims are silent on the question. Reading the claims, the "customer service station" includes certain items, and the "product finishing station" includes certain other items. However, it does not appear that the stations must be separate. So long as the items mandated in the claims are present in specific discernible location(s), the patent does not appear to preclude the possibility that the stations could overlap or even be one.

Finally, Jamba Juice argues that Foodie's construction is an overbroad definition. Jamba Juice claims Foodie is proposing that, while the claims mandate that certain items are in the customer service station, the items do not necessarily need to be located together. The Court agrees

12

with Jamba Juice that the patent's claims and the specification seem to indicate that the "customer service station" is meant to be a specific area encompassing the items stated in the claims.  However, Jamba Juice's arguments that "station" means an area within reach of an employee are not supported by the specification or claims.  At the *Markman* hearing, Jamba Juice stated they offered this portion of the construction largely out of concerns for limiting the boundaries of the area(s).  The best support for defining the boundaries of the customer service station's area comes from the claim itself.  In the claim, "customer service station" is said to be comprised of certain items, including things such as a drip pan and breath guard.  '448 patent col. 8 l. 11-12.  The drawings accompanying the patent include the items stated in the claim, and seemingly limit the "customer service station" to a specific area(s) extending a short distance beyond the enumerated items stated in the claims.

With all of the above in mind, the Court's construction of "customer service station" attempts to take all of the parties' concerns into account: "A station from which a customer can be served, and includes a cold pan, a drip pan, a breath guard, at least one refrigerated source liquid conduit line, and the refrigerated source liquid conduct line connecting said refrigerated source liquid and said consumer service station beverage tapping mechanism."[4]  The Court's construction does not preclude more than one customer service station, and remains consistent with the claims by limiting the bounds of a customer service station to the inclusion of, at a minimum, the items stated in the claim. The construction also takes into account Jamba Juice's concerns that Foodie was expanding the boundaries beyond what the patent claims by using "station" instead of "area" or "location."  A "station" inherently is easier to conceptualize as a limited area than more expansive terms such as

---

[4]In the parties' original proposed constructions, both parties included some language referencing service to the customer as part of their construction of "customer service station," which the Court construes as agreement between the parties on the "from which a customer can be served" portion of the Court's definition.

"area" or "location."  Station is in turn defined by what the claims mandate the "customer service station" encompasses, and is further limited to a station(s) where customers can be served.

### 5.    *"A product finishing station"*

Many of the same concerns fueling the parties proposed constructions for "customer service station" are also present in their proposed constructions of "product finishing station."  Foodie offers for its construction "any area(s) where product finishing is located," while Jamba Juice offers "a specific defined location, separate from the customer service station, where an employee stands and remains to operate blending units, access ice, dispense cups, rinse blenders and place them on a drain board.  All the elements contained within the product finishing station are within reach of a stationary employee."

The Court's analysis of the parties' construction is the same as it was for "customer service station."  There is insufficient support in the patent mandating that a customer service station and product finishing station *must* be separate.  While items such as Fig. 2, which show separate stations, may show a preferred embodiment, this by itself does not limit the patent in such a manner.  However, the Court does agree with Jamba Juice that the area is intended to be limited to a "station," encompassed by the items called for in the claims.  *See* '448 patent col. 8 l. 16-19.  Therefore, the Court's construction for "product finishing station" is: "a station including at least one blending unit, an ice bin, at least one cup dispenser and foot or hand activated rinse sink with integrated or detached drain board."

### 6.    *"Consumer service station beverage tapping mechanism"*

The parties agreed that the definition of "consumer service station beverage tapping mechanism" should at its base be "a mechanism located in the customer service station through

which refrigerated source liquids are dispensed."  However, Foodie wanted the word "operatively" included in the definition out of concern that if it was not included, embodiments where part of the operation is done outside the station(s) and part of it is in the station(s) might be precluded, which Foodie believes is inconsistent with the specification.  At the *Markman* hearing, Foodie noted they could "live without" operatively being included in the definition, and the inclusion of "operatively" would seem to confuse the definition more than it would clarify the term.  Accordingly, the Court adopts the parties' agreement, without the term "operatively," as the Court's construction.

7.      *"A cold pan"*

For the term "a cold pan," Foodie offers "a refrigerated container," while Jamba Juice offers "an open, shallow, refrigerated bin."  The primary dispute over this term was whether or not to include "shallow" and "open" as descriptive modifiers, and whether the noun term should be "pan" or "container."  At the *Markman* hearing, Foodie agreed to allow for the adjective "open" to be included, but only if "container" was the noun. Foodie objected to the use of "shallow" in the definition. Jamba Juice objected to the term "container" on the grounds that "pan" is narrower.  In support of its argument for including "shallow," Jamba Juice argues that "the term container, which appears in the definition of the word pan, is modified by the adjective shallow in the definition."[5] (Def.'s Resp. Claim Constr. Br. 21.)  Foodie argues in response that "shallow" need not be part of the construction because doing so would be reading a limitation in the claim unnecessarily.  The Court agrees with Foodie.

The specification does not define "pan," nor does it discuss the cold pan in terms of being open or shallow.  Adding such limitations would be based on purely extrinsic evidence.  While the

_____

[5]At the *Markman* hearing, Jamba Juice also argued that the definition of "pan" includes "shallow."

dictionary definition of "pan" does include "container," "open," and "shallow," the Court is hesitant to read those terms into the claim.  There is little risk of jury confusion by failing to further elaborate on the term "pan," and potentially greater risk for the parties in narrowing or broadening the term with the other modifiers.  Given the above considerations, and since both parties suggested "refrigerated" in their proposed definitions, the Court construes "cold pan" to mean "a refrigerated pan."

8.    *"A drip pan"*

For "a drip pan," Foodie offers "a pan for collecting drippings," while Jamba Juice offers "an open, shallow bin for droppings located in the product finishing station."  The Court has already elaborated on its reasoning for not including the modifiers "open" and "shallow" in the term, and the specification provides no more support for reading these modifiers into "a drip pan" than they did for "a cold pan."  *See supra* discussion pp. 13-14.  At the *Markman* hearing, Jamba Juice indicated they would be amenable to taking out the "located in the product finishing station" language in the definition, and the Court agrees that it need not be included.  There appears to be no substantial difference between "drippings" or "droppings," though the patent itself uses "drip," and in the interest of consistency, the Court will also adopt drippings as a derivation of the word drip.  Therefore, the Court construes the term "a drip pan" to mean "a pan for collecting drippings."

9.    *"A breath guard"*

For the term "a breath guard," Foodie proposes "a barrier, such as distance, space, or solid materials, that provides protection from contaminants originating from a human's mouth or nose."  Jamba Juice offers "a protective piece positioned between the customer and the customer service station to reduce the likelihood of ingredient contamination by the customer."  Before analyzing the

16

substance of the parties' different interpretations, it is important to note the parties have agreed on substantial parts of the term's definition, including use of the term "barrier."[6]  The parties also agree on the breath guard's purpose.  As noted by Foodie, "the specification references the purpose of the breath guard is to reduce the likelihood of ingredient contamination during periods of consumer discourse and beverage preparation."  Pl.'s Open. Markman Br. 29.  Finally, the parties agreed that the "breath guard" should be positioned between the customer and the customer service station.  *See* Transcript of *Markman* Hearing at 61, *Foodie Partners v. Jamba Juice Co.*, Civ. No. 2:06-cv-12 (E.D. Tex. 2007).

The dispute between the parties resides largely on the nature and positioning of the "breath guard."  Regarding the nature of the breath guard, the dispute centers around whether or not the guard itself is a tangible object, or if something such as distance or air could qualify as a barrier for purposes of a breath guard.  Foodie advances a number of arguments to support an interpretation that air or distance qualify as a "breath guard" under the patent.  First, Foodie claims that inclusion of the term "breath" as a modifier for "guard" indicates the purpose is to guard against exhaled air during breathing or sneezing, and therefore distance or space would be an acceptable guard.  Second, Foodie argues that the Ask.com Online Dictionary definition of "guard" is "something that gives protection; a safeguard," which they claim, as understood by one of ordinary skill in the art, would include

---

[6]While they did not initially propose "barrier" in their construction, at the *Markman* hearing, Jamba Juice made it clear that they felt a breath guard meant a "physical barrier."  *See* Transcript of *Markman* Hearing at 56, *Foodie Partners v. Jamba Juice Co.*, Civ. No. 2:06-cv-12 (E.D. Tex. 2007).  On the other hand, Foodie's proposed definition uses "barrier," though as they pushed for the inclusion of space or distance in the definition of "breath guard" at the *Markman* hearing, Foodie's counsel later back-tracked from "barrier," saying "maybe barrier is not the most appropriate term, but I was just thinking as we were sitting here maybe it would be more appropriate to say 'mechanism such as distance or space or solid materials that provide protection.'"  Counsel's second proposition was largely presented after argument over whether "barrier" included physical space, and was only offered off-the-cuff as an alternative to account for any ambiguity of whether "barrier" might include physical space.  Regardless of whether "barrier" can include physical space/distance, the Court finds that "barrier" is the best term for this definition.

17

distance or a wall–anything that would provide protection from bodily contaminants.  Finally, Foodie

references various health and safety standards as supporting extrinsic evidence, including the

California Health and Safety Code and the National Sanitation Foundation Standard No. 2.[7]  Foodie

claims their interpretation of allowing space or distance to be included as a barrier is specifically

based on the California Health and Safety Code's provisions allowing space and distance to qualify

as contaminant-reduction mechanisms.  Foodie also claims it chose the California code because it

has a reputation as being one of the most stringent in the industry, and therefore one of ordinary skill

in the art would understand that space or distance would satisfy the purpose of a "breath guard."

In response, Jamba Juice argues that the standards cited by Foodie are not uniform throughout

the country, and that they are merely citing an alternative to an actual breath guard, not something

that should be used to interpret the term.  Instead, Jamba Juice turns to the patent's specifications

in arguing that space and distance are not covered by the patent's reference to a "breath guard."  As

referenced in the patent, the most detailed information regarding a "breath guard" states that "a

consumer breath guard 2.40 is attached to the [customer services station] to reduce likelihood of

ingredient contamination during periods of consumer discourse and beverage preparation."  '448

patent col. 6 l. 23-26.  Jamba Juice argues that because the term "attached" is included, the patent

specifically requires that a "breath guard" be something tangible–something that can actually be

attached to the customer service station.  In response, Foodie counters that this section would be a

preferred embodiment, but that it does not preclude space or distance.  Looking at both the ordinary

meaning of the term, and the term's use and description in the specification, the Court agrees with

---

[7]Regarding the National Sanitation Foundation Standard No. 2, Foodie argues the standard provides information on the function of a breath guard, but "allows significant latitude on its form, construction, materials and design."  Pl.'s Open. Markman Br. 30.

Jamba Juice that a "breath guard," as referenced in the '448 patent, does not include space or distance.

As noted above, the parties both included "barrier" either in their construction, or argued for its inclusion at the *Markman* hearing.  The definition of the term "barrier" includes "a material object or set of objects that separates, keeps apart, demarcates, or serves as a unit or barricade," WEBSTER'S 3D NEW INT'L DICTIONARY 179 (3d ed. 1961), and also "any natural bar or obstacle" and "anything that restrains or obstructs progress, access."   Dictionary.com, http://dictionary.reference.com/browse/barrier.  The first definition above would seem to negate any possibly of distance or space being included, while an argument could be made that distance or space would be a "natural bar" or "anything that ... obstructs" under the second and third definitions.  However, in order to "attach" something to the customer service station, as noted in the patent, it would take some liberal stretching of the meaning of attach to believe that air or space or distance, all essentially intangible, could somehow be attached to the customer service station.  The Court agrees with Foodie that the specification is only delineating a preferred embodiment and is therefore not absolutely dispositive.  Nonetheless, the specification offers clear support that the "breath guard" is meant to be limited to tangible objects that can actually be attached to the customer service station.  The entire focus of the patent is to conserve space through the various measures it outlines, which makes arguing that distance should be included as a possible "breath guard" a counterintuitive exercise.  Finally, the Court agrees with Jamba Juice's argument that many of the standards that Foodie cites are offering space or distance as an alternative to a breath guard, not a breath guard in itself.  Accordingly, the Court must reject Foodie's proposition that "breath guard" includes distance or space, and finds that the barrier aspect of the "breath guard" was meant  to include only tangible

19

objects protecting ingredients from human contamination.

With the above considerations in mind, the Court construes the term "breath guard" to mean "a protective barrier positioned between the customer and the customer service station to reduce the likelihood of ingredient contamination by the customer."

### CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above.  For ease of reference, the Court's claim interpretations are set forth in a table attached to this opinion as Appendix A.

**So ORDERED and SIGNED this 30th day of October, 2007.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

20

# APPENDIX A

# DISPUTED TERMS

| CLAIM TERM | PLAINTIFF'S PROPOSED CONSTRUCTION | DEFENDANT'S PROPOSED CONSTRUCTION | COURT'S CONSTRUCTION |
|---|---|---|---|
| **A remotely located refrigeration unit** | A structure, for storing at least one source liquid below room temperature, which is located outside of the customer service station and connected to it through at least one refrigerated source liquid conduit line. | A structure for storing substances at temperatures below room temperature displaced from the customer service station. | A structure for storing substances at temperatures below room temperature displaced from the customer service station. |
| **Refrigerated source liquid conduit line** | At least one channel through which the source liquid is conveyed from the refrigeration unit. | A channel (or pipe) through which a refrigerated source liquid is conveyed. | A channel through which a refrigerated source liquid is conveyed. |
| **A customer service station** | Any area(s) from which a customer can be served. | A specific defined location where an employee stands to dispense the refrigerated source liquid and delivers the consumer consumption vessel to the consumer. All elements contained within the customer service station are within reach of a stationary employee. | A station from which a customer can be served, and includes a cold pan, a drip pan, a breath guard, at least one refrigerated source liquid conduit line, and the refrigerated source liquid conduct line connecting said refrigerated source liquid and said consumer service station beverage tapping mechanism. |
| **A product finishing station** | Any area(s) where product finishing is located | A specific defined location, separate from the customer service station, where an employee stands and remains to operate blending units, access ice, dispense cups, rinse blenders and place them on a drain board.  All the elements contained within the product finishing station are within reach of a stationary employee. | A station including at least one blending unit, an ice bin, at least one cup dispenser and foot or hand activated rinse sink with integrated or detached drain board. |

| | | | |
|---|---|---|---|
| **A drip pan** | A pan for collecting drippings | An open, shallow bin for droppings located in the product finishing station | A pan for collecting drippings |
| **A cold pan** | A refrigerated container | An open, shallow, refrigerated bin. | A refrigerated pan |
| **A breath guard** | A barrier, such as distance, space, or solid materials, that provides protection from contaminants originating from a human's mouth or nose. | A protective piece positioned between the customer and the customer service station to reduce the likelihood of ingredient contamination by the customer. | A protective barrier positioned between the customer and the customer service station to reduce the likelihood of ingredient contamination by the customer. |
| **Consumer service station beverage tapping mechanism** | At least one device operatively located in the customer service station through which refrigerated source liquid(s) are dispensed. | A machine or mechanical appliance located at the customer service station through which refrigerated source liquid(s) are dispensed. | A mechanism located in the customer service station through which refrigerated source liquids are dispensed. |
| **Refrigerated source liquid** | At least one juice, yogurt, etc., which serves as base level ingredients in the preparation of pulverized, slush-like consistency consumer beverages. | Juice, yogurt, etc., which serves as base level ingredients in the preparation of pulverized, slush-like consistency consumer beverages. | Juice, yogurt, etc., which serves as base level ingredients in the preparation of pulverized, slush-like consistency consumer beverages. |

## AGREED TERMS

| CLAIM TERM | AGREED CONSTRUCTION | COURT'S CONSTRUCTION |
|---|---|---|
| **A portion control mechanism** | A mechanism for controlling the amount of source liquid dispersed according to preset volume or time metered constraints. | A mechanism for controlling the amount of source liquid dispersed according to preset volume or time metered constraints. |
| **Beverage flow reporting device** | A mechanism or computer-based system which collects and reports beverage flow data. | A mechanism or computer-based system which collects and reports beverage flow data. |
| **Beverage flow measurement device** | A mechanism or computer-based system for ascertaining a quantity of flow of at least one source liquid | A mechanism or computer-based system for ascertaining a quantity of flow of at least one source liquid |
| **Integrated or detached drain board** | A surface that is joined with the rinse sink, but can be separate from the rinse sink. | A surface that is joined with the rinse sink, but can be separate from the rinse sink. |